### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE P. PRINGLE, individually and in her capacity as a registered voter and Elector, | ) ) ) | |
| KENNETH FLETCHER, individually and in his capacity as a registered voter and Elector, | ) ) ) | |
| BONNIE S. GOULD, individually and in her capacity as a registered voter and Elector, | ) ) ) | |
| BRENDA GARRAND, individually and in her capacity as a registered voter and Elector, | ) ) ) | |
| and | ) ) | |
| LAWRENCE WOLD, individually and in his capacity as a registered voter and Elector, | ) ) ) | Civil Action No. 1:23-cv-00453-NT |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| AARON FREY, Attorney General of the State of Maine, | ) ) ) | |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, | ) ) ) | |
| and | ) ) | |
| WILLIAM J. SCHNEIDER, chairman, DAVID R. HASTINGS, III, member, SARAH LECLAIRE, member, DENNIS MARBLE, member, STACEY D. NEUMANN, member, in their official capacities as members of the Commission on Governmental Ethics and Election Practices, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW</u>

### I.      BACKGROUND

On November 7, 2023, Maine voters approved an initiative proposed pursuant to Article IV, Part Third, Section 18 of the Constitution of Maine, entitled "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution".  ("the Initiative").  A copy of the Initiative is attached to Plaintiffs' Complaint as <u>Exhibit A</u> (ECF 1-1, pp. 49-53).

Plaintiffs are all registered Maine voters and Electors within the meaning of Article II and related provisions of the Constitution of Maine.   Plaintiffs seek declaratory and injunctive relief as to Initiative's constitutionality against Defendants  Aaron Frey in his capacity as the Attorney General of Maine and the Commission of Governmental Ethics and Election Practices and its members ("the Commission").

### Terms of the Initiative

The Initiative bars the use of information generated through contributions or donations to, or expenditures or disbursements by, designated foreign entities "to influence…the initiation or approval of a referendum."   *Id*. at Sec. 1, § 1064(2); see also, *Id*. at Sec. 1.[1]

Section 1 of the Initiative amends Title 21-A of the Maine Revised Statutes by adding a new section—Section 1064. *Id*. at Sec. 1-§ 1064(1)-(11).   Section 1 is directed at "foreign government-influenced" entities and "foreign government-owned entities".[2] *Id.* at Sec. 1-§

---

[1] The Initiative includes a second section—Section 2—which did not enact a law but, rather, urged members of the Maine Congressional Delegation to support an "anticorruption" amendment to the United States Constitution. Section 2 did not enact a law and, therefore, was not the proper subject of an initiative.  *See*, *Moulton v. Scully*, 111 Me. 428, 89 A. 944, 952-953 (1914). Nevertheless, Plaintiffs do not challenge the constitutionality of Section 2 in this litigation.

[2] "Foreign government-owned entity" is defined by Sec. 1-§ 1064(1)(F) to include "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares."

1064(E), (F). The Initiative defines "foreign government-influenced entity" to include a "foreign government" or an entity in which a "foreign government" or "foreign government-owned entity" either "holds, owns, [or] controls . . . 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests" or "directs, dictates, controls or directly or indirectly participates in the decision-making process" of the entity.  (hereinafter "Foreign Entities").   The Initiative bars such Foreign Entities from "mak[ing], directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication, or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." *Id.* at Sec.1-§ 2.[3]

Section 1 applies to six forms of popular sovereignty defined in Section 1064(1)(I)(1)-(6).  The forms of popular sovereignty listed, all grounded in the Maine Constitution, are: (1) the people's veto under Article IV, Part Third, Section 17; (2) the direct initiative under Article IV, Part Third, Section 18; (3) the ratification of a constitutional amendment under Article X, Section 4; (4) a legislative proposal issued to the Electors bv the Legislature under Article IV, Part Third, Section 19; (5) the ratification of the issue of bonds under Article IX, Section 14; and (6) any county or municipal referendum.[4] *See* Article IV, Part Third, Section 21. *Id.* at Sec. 1-§ 1064(1)(I)(1)-(6) (hereinafter, at times, "Referendum" or "Ballot Measures").

Section 1064(2) is the core of the Initiative.  Its sweeping prohibitive terms permeate every aspect of the Initiative and provide the foundation for the criminal and civil sanctions to Plaintiffs and all others are exposed.  Therefore, a close examination of  its terms is required.  As applied to Ballot Measures, Section 1064(2) bars Foreign Entities from:

---

[3] Plaintiffs do not, in this litigation, challenge the constitutionality of the Initiative as it applies to "the nomination or election of a candidate."
[4] Given the number of Maine municipalities, this memorandum is limited to discussion of the five statewide Ballot Measures listed in Section 1064(1)(I)(1)-(5).

mak[ing], directly or indirectly, a contribution, expenditure…or any other donation or disbursement of funds to influence…the initiation or approval of a referendum. [56]

**Initiation and Approval:**  Section 1064(2)  applies to the "initiation or approval" of any of the six Ballot Measures listed at Section 1064(1)(I)(1)-(6).[7]  By its plain terms, it covers the entirety of the legislative process by which any Section 1064(1)(I) Referendum may be presented to voters for their approval or rejection.

**Petition-Originated Legislation**:  Section 1064(2)'s use of the word "initiation," itself, must be compared to the broad range of Ballot Measures the Initiative covers.  Section 1052 of Title 21-A describes rather than defines "initiation," advising that it "includes the collection of signatures and related activities to qualify a state or local initiative or referendum for the ballot."  21-A MRS § 1052(4-B).  This description applies to those Ballot Measures that are commenced by petition, but only two of the statewide Ballot Measures listed in Section 1064(1)(I)—the people's veto and the direct initiative—are commenced by petition.  *See*, Me. Const., art. IV, Pt. 3d, §§ 17-18.

---

[5] The term "electioneering communication" is referred to at 21 MRS § 1014(1), (2) and (2-A).  Exhibit A at Sec. 1-§ 1064(1)(B); *Cf.*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 321 (2010) (discussing "electioneering communication" as defined in federal statute.)  The term "electioneering communication" is not either defined or referred to in Section 1052 of Title 21-A which governs referenda, initiatives and other ballot measures.  *Cf.*, 21-A MRS § 1014(1), (2), (2-A); § 1052(1)-(5).  By contrast, the terms "contribution" and "expenditure" are defined at Section 1052(3) and (4). See, 21-A MRS § 1052(3)-(4).  It appears, therefore, that "electioneering communication" does not apply to Ballot Measures.

[6] "Independent expenditures" are defined as expenditures made independent of "a candidate, a candidate's authorized political committee or an agent of either. . . ." 21-A MRS § 1019(1).  The term "independent expenditure" is not defined or referred to in Section 1052 of Title 21-A—the definition section governing reports on ballot questions.  *See*, 21-A MRS § 1052(1)-(5).  It appears, therefore, that "independent expenditures" does not apply to Ballot Measures.

[7] Five of the Ballot Measures listed in Section 1064(1)(I) are in the Maine Constitution: 1) the people's veto, art. IV, Pt.3d, § 17; 2) the direct initiative art. IV, Pt. 3d, § 18; 3) Constitutional amendments, art. X, §4; and 4) bond approvals, art. IX, § 14.  Exhibit A, Sec.1-§ 1064(1)(I)(1)-(5).  The last category covers country and municipal Ballot Measures. *Id.,* at § 1064(1)(I)(6).

**Legislature-Originated Legislation**:  The three other statewide Ballot Measures covered by the Initiative—popular approval of an amendment to the Constitution, conditional legislation issued by the Legislature for voter approval, and the ratification of bonds—are initiated by the Legislature.  *See*, Me. Const., art. X, § 4, art. IV, Pt. 3d, § 19, art. IX, § 14.   Therefore, Section 1052(4-B)'s definition does not apply to them.

Lacking a statutory definition for "initiation" for Ballot Measures originating with the Legislature, a dictionary must be consulted. *See*, *McDonald v. City of Portland*, 2020 ME 119, ¶¶ 20-21, 239 A.3d 662.  The dictionary definition of "initiation" is tied to the dictionary definition of the word "initiate" which, in turn, is defined as:  "to cause or facilitate the beginning of : set going." Merriam-Webster's Collegiate Dictionary (ed. 2003).  Therefore, as to Ballot Measures originated by the Legislature, Section 1064(2) applies to the very earliest point at which individual members of the Legislature begin consideration of a proposal for possible submission to the voters at large for approval.

Beyond the "initiation" of a Ballot Measure, Section 1064(2) also applies to its "approval." For all the Section 1064(1)(I) Ballot Measures, "approval" means a vote on a given Ballot Meausure by registered voters and Electors exercising their sovereign lawmaking powers.

Thus, Section 1064(2) applies to the entirety of the legislative process by which a Ballot Measure is presented to the voters for approval.  For those Ballot Measures initiated by petition, it applies to the earliest stages of that process, and for those initiated by the Legislature, it applies to the first point at which Legislators begin their consideration of a given Ballot Measure.   And, for all Ballot Measures, it extends through the point at which a Ballot Measure is considered in a general election.

5

**Contributions/Expenditures/Donations/Disbursements:**   Section 1064(2) prohibits "contributions" and "expenditures" as well as "any other donations or disbursement of funds," if they are made "to influence...the initiation or approval of a referendum."[8]  The Initiative expressly incorporates by reference Section 1052's definitions of "contribution" and "expenditure."  Exhibit A, Sec. 1-§ 1064(1)(A), (C).

The statutory definition of "contribution" is expansive applying in pertinent part to, "[a] gift, subscription, loan, advance or deposit of money or anything of value by a committee for the purpose of initiating or influencing a campaign."[9]  The statutory definition of "expenditure" is also broad applying in pertinent part to "[a] purchase, payment distribution, loan, advance, deposit or gift of money or anything of value, made for the purpose of initiating or influencing a campaign." 21-A MRS § 1052(4)(1); *see also*, *Id.* at § 1052((1-A)-(3).

Although the meanings of "contribution" and "expenditure" have been defined by statute, that is not true of the terms "any other donation" or "any...disbursement of funds."   Therefore, accepted dictionary definitions must be consulted.  *McDonald*, 2020 ME 119, ¶¶ 20-21, 239 A.3d 662.  At this point, it is sufficient to note that both terms are modified by the word "any" which means they must   be applied broadly.   *National Council on Compensation Insurance v. Superintendent of Insurance*, 481 A.2d 775, 780 (common meaning of "any" is "no matter which one"). These terms must, therefore, be broadly construed.

**Influence:**   As Section 1064(4) is the Initiative's core provision, the word "influence", is its key concept.  Section 1064(2) bars Foreign Entities from making contributions, donations,

---

[8] The Initiative expressly incorporates by reference the definitions of "contribution" and "expenditure" in Section 1052 of Title 21-A.  Exhibit A, Sec.-§ 1052(A) and (C).  The terms "any other donation" and "any...disbursement of funds" are not defined either in the Initiative or in Title 21-A of the Maine Revised Statutes.

[9] The definition of "contribution" is supplemented by more a particular list of acts that constitute contributions.  21-A MRS § 1052(3)(A)-(D).

expenditures or disbursements "to influence" the initiation or approval of a referendum.  In general usage, the word "influence" is inherently vague[10], and the Initiative does not define it.  Section 1052(4-A) of Title 21-A defines "influence" as meaning "to promote, support, oppose or defeat." 21-A MRS § 1052(4-A).[11]  These four words are sufficiently broad to encompass the entirety of activities associated with the public's consideration of a given Ballot Measure.  They cover everything from highly organized and well-funded campaigns to approve or defeat such a measure, with all the myriad ways of communicating internally and to the public such campaigns necessarily entail, to highly individual attempts to communicate with neighbors, friends, and family.

The common concept that knits these four words together is that of persuasion. And, persuasion, in turn, assumes communication from one to another, or to many others, through a seemingly limitless array of instruments and media now so readily available. In sum, "influence", as used in Section 1062(4), should be interpreted as applying all the means people may employ when they communicate for the purpose of persuading others to promote, support, oppose or defeat a Ballot Measure.  In the arguments that follow, this memorandum uses "influence" in this sense.

**Persons Influenced:**  The prohibition on the use of Foreign Entities' monies to "influence" necessarily applies to those persons with the capacity to "initiate" and those with the capacity to "approve" a given Ballott Measure; that is, to attempt to persuade them to promote, support, oppose or defeat that Ballot Measure.  As has been seen, only two Ballot Measures may be initiated by petition—the people's veto and the direct initiative—the remaining three—constitutional

---

[10] See, *e.g.,* "**Influence**: "The act or power of producing an effect without apparent exertion of force or direct exercise of command." Merriam-Webster's Collegiate Dictionary (ed. 2003)

[11] "Influencing" appears within the definition of "contribution" and "expenditure".  21-A MRS §§ 1052(3), (4).  As noted, Section 1064(2)'s additional terms "any other donation" and "any…disbursement" are not statutorily defined, and, therefore, it is unclear whether Section 1052(4-A)'s definition of "influence" applies to them.  Without conceding the point, for purposes of this memorandum, Plaintiffs will assume that Section 1052(4-A)'s definition applies to Section 1064(2) in its entirety.

amendments, conditional legislation, and bonds—are initiated by the Legislature.  Therefore, the Initiative bars Foreign Entities from contributing or expending monies to influence would-be petitioners or members of the Legislature when a Ballot Measure is being initiated.

Ultimately, Ballot Measures are considered by the Electors or voters at large for approval. Therefore, the  Initiative bars Foreign Entities from contributing or expending monies to influence Electors or voters at large in the approval of a given Ballot Measure.

Aside from the initiation and ultimate approval of a Ballot Measure, it should be noted that the direct initiative authorizes the Electors to propose legislation for popular approval.  However, it also provides a distinct and definite role for the Legislature which, upon presentation of such proposed legislation, has three options:  it may enact the proposed legislation without change; it may propose legislation of its own to the voters as a competing measure; or, it may take no action. Me. Const., art. IV, Pt. 3d, § 18.   Because the Initiative applies to the entirety of the legislative process for every Ballot Measure, it necessarily applies to the Legislature's consideration of its options when presented with a direct initiative.  Therefore, Section 1064(2) bars Foreign Entities from contributing or spending money "to influence" legislators in their consideration of the actions they might take with respect to any direct initiative.

**Directly or Indirectly**: Finally, Section 1064(2) bars Foreign Entities from seeking to influence "directly or indirectly."   This phrase is comprehensive and, in effect, encompasses all manner and means by which the Foreign Entities might seek to communicate—that is, "influence"—legislators or Electors in their exercise of their lawmaking powers with respect to Ballot Measures.

**Application of Prohibited Conduct to all Persons:** Although Section 1064(2) is directed at the Foreign Entities defined in Section 1064(1)((E) and (F), the Initiative's reach is broader—

8

indeed, it is limitless.   Section 1064(11), which is headed  "Applicability", expressly eschews the limitations set forth at 21- A MRS § 1051 (governing Ballot Measures) and, instead, provides that the Initiative applies to "all persons." Exhibit A, Sec. 1-§ 1064(11).  In addition, Section 1064(3) through Section 1064(5) describes particular prohibited conduct—all tied by to Section 1064(2)— which apply to any person.

First, Section 1064(3) provides that a person may not "knowingly solicit, accept, or receive a contribution or donation prohibited by [Section 1064(2)]."   Exhibit A, Sec. 1-§ 1064(3). Although not cited, the word "knowingly" is derived from the Maine Criminal Code.   17-A MRS § 35(2).

Second, Section 1064(4) provides that a person may not "knowingly or recklessly provide substantial assistance, with or without compensation" for either of the following:  A) "the making, solicitation, acceptance or receipt of a contribution or donation prohibited by [Section 1064(2)]" or B) "the making  of an expenditure…or  disbursement  prohibited  by  [Section  1064(2)]." Although not cited, the word "recklessly" is derived from the Maine Criminal Code.  17-A MRS § 35(3); Exhibit A, Sec. 1-§ 1064(4).

Third, Section 1064(5) provides that a person "may not structure or attempt to structure a solicitation,  contribution,  expenditure…or  disbursement  or  other  transaction  to  evade  the prohibitions and requirements of [the Initiative in its entirety.]."  Exhibit A, Sec. 1-§ 1064(5).

Sections 1064(3)-(5) apply in full to the Plaintiffs individually and in their capacities as registered voters and Electors.  Section 1064(3) bars Plaintiffs, and all other persons, from making a contribution or a donation or an expenditure or disbursement to influence the initiation or approval of a Ballot Measure in violation of Section 1064(2).  Section 1064(4) bars Plaintiffs, and all other persons, from providing "substantial assistance" with respect to a contribution or donation

or expenditure or disbursement to influence the initiation or approval of a Ballot Measure in violation of Section 1064(2). Section 1064(5) is framed even more broadly than the other prohibitory provisions, barring any "attempt to structure", not only contributions, donations, expenditures, and disbursements, but also "solicitations" or any "other transaction" for the purpose of "evad[ing] the prohibitions and requirements of [the Initiative]." *Id*. at Sec. 1-§ 1064(5).

**Civil and Criminal Sanctions:**  The Initiative subjects all persons, including Plaintiffs, to severe civil and criminal sanctions for transgressing its terms.  Section 1064(8) authorizes the Commission to impose penalties of "not more than $5,000 or double the amount of the contribution, expenditure…donation or disbursement involved in the violation, whichever is greater for a violation of [the Initiative]."  Exhibit A, Sec. 1-§ 1064(8).  An aggravating factor is whether the violation was "intentional." *Id.*

In addition, Section 1064(9) provides that any violation of Section 1064(2) (barring Foreign Entities from making contributions, donations, expenditures, or disbursements to influence the initiation or approval of an Initiative) is a Class C crime.[12]  Exhibit A, Sec. 1-§ 1064(9).  It provides further that any violation of Sections 1064(3)-(5), which apply to all persons, including Plaintiffs, is also a Class C crime.  *Id*., Sec.1-§1064(9).

## II.   STANDARDS FOR INJUNCTIVE RELIEF

Injunctive relief is an equitable remedy intended to "preserve the status quo pending a final determination of the questions raised by the [complaint]." *Decker v. Independence Shares Corp*., 311 U.S. 282, 290 (1940); *see also Matos v. Clinton School Dist*., 367 F.3d 68, 72 (1st Cir. 2004) ("The aim of a preliminary injunction 'is to preserve the status quo, freezing the existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to

---

[12] Under Maine criminal law, a Class C crime is a felony and is punishable by imprisonment for to five years and a fine of up to $5,000. 17-A MRS § 1604(C), 17-A MRS § 1704(3).

remedy discerned wrongs.'" (internal citation omitted)).  The "propriety of its issue is dependent on the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009).

Four factors govern the issuance of injunctive relief: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure other parties interested the proceeding; and, (4) where the public interest lies." *Id.* at 434; *see A.M. by & through Norris v. Cape Elizabeth Sch. Dist.*, 422 F. Supp. 3d 353, 358 (D. Me. 2019), *aff'd on other grounds sub nom. Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) (internal citations omitted); *see also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996).

"There is substantial overlap between these and the factors governing preliminary injunctions, [citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008)], not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken,* 556 U.S. at 434.

Of the four factors, the first two—likelihood of success and irreparably injury—"are the most critical." *Id.*   "The sine qua non of this four part test is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

An injury is "irreparable" if it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). A plaintiff

must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter*, 555 U.S. 22, (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction"). Irreparable harm, however, does not require a showing that "the denial of injunctive relief will be fatal to [the plaintiff's] business." *Ross-Simons*, 102 F.3d 18.

The degree of irreparable harm necessary to support injunctive relief also depends, in part, on how likely it is that the plaintiff's claims will succeed. *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Therefore, when "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary relief." *Irizarry*, 587 F.3d at 485, quoting, *EEOC v. Astra USA, Inc*., 94 f.3d 738, 743 (1st Cir. 1996). That is, a court may apply a "sliding scale" to the likelihood of success and irreparable harm factors. *Id.*

## III.   ARGUMENT

### A.   Plaintiffs are likely to succeed on the merits of all their claims.

#### 1.   Plaintiffs are likely to prevail in their claim that the Initiative violates their First Amendment right to Petition the Government.

As has been noted, Plaintiffs have limited their challenge to the Initiative's application to the "Referendum" listed in Section 1064(1)(I)(1)-(6).  Plaintiffs are all registered Maine voters and are, thereby, "Electors" under Article II of Maine Constitution.[13]

---

[13] Maine voters are also referred to as "Electors" when they vote for representatives to the House of Representatives, when they vote for Senators, and when they vote for Governor  Me. Const., art. IV, Pt. 1, § 2; *Id*., art. IV, Pt. 2, § 1.  Three of the Section 1064(1)(I) Ballot Measures also use this term. *Id*. at art. IV, Pt. 3d, §17-18, art. IX, § 14.  For two of the Ballot Measures in Section 1064(1)(I), the term is not used. Conditional legislation, referred to Section 1064(1)(I)(4) is "referred to the people for a majority of the

From its inception as a State, the Maine Constitution has provided that only the Legislature has the power to propose constitutional amendments, and only the voters at large have the power to approve them.  Marshall J. Tinkle, The Maine State Constitution, (ed. 2013) at 180-181; *see*, Me. Const., art. X, § 4.  Bond proposals also originate exclusively with the Legislature but require the Electors' approval.  Me. Const, art. IX, § 14; *see also*, M. Tinkle, The Maine Constitution at 165-166.

In 1909, Maine voters amended the State's Constitution to add the people's veto, the direct initiative, conditional legislation, and authorization for municipal Ballot Measures.   Me. Const., art. IV, Pt. 3d, §§ 17-22.  These amendments vested the Electors with lawmaking powers that were comparable to, but not entirely the same as, those possessed by the Legislature. The Law Court has consistently recognized that these amendments invested the Electors with **legislative** power: "the people reserved to themselves the power to propose laws and to enact or reject the same at the polls independent of the legislature." *Farris ex rel. Dorsky v. Goss,* 143 Me. 227, 230 (1948). Explaining further, the Law Court stated, "[i]n short, sovereign, which is the people, has taken back, subject to the terms and limitations of the amendment, a power which the people vested in the legislature when Maine became a state." *Id*. at 230-231.   Subject to the terms of those amendments, the people's power to enact laws is "absolute and all embracing." *Town of Warren v. Norwood*, 138 Me. 180, 192-193 (1941); *see also, Opinion of the Justices*, 623 A.2d 1258, 1262 (Me. 1993). These principles apply fully to the authority Maine Electors wield with respect to constitutional amendments and the issuance of bonds.   With to the exercise of all these powers, the Electors are the lawmaking body—they are "the government."

---

votes thereron." *Id.,* at art,, IV, Pt. 3d. § 19.   Constitutional amendments are referred to "the inhabitants of …towns and plantations."  *Id.* at art. 10, §4.  Notwithstanding these distinctions, Plaintiffs use of the term "Electors" applies all the Ballot Measures listed in Section 1064(1)(I).

In *Moulton v. Scully*, the Court held that the initiative power did not extend to the impeachment of a police officer because that was not a legislative act.   111 Me. 428, 89 A. 944, 952-953 (1914).  The Court emphasized that this power applied "only [to] the legislation, to the making of laws, whether it be a public act or a private resolve, having the force of law."  *Id*. at 953; *see also*, *Opinion of Justices*, 118 Me. 544, 107 A. 673, 674-676 (1919) (concluding that popular ratification of an amendment to the federal constitution was "in no sense legislation" and was invalid).  Therefore, the powers of popular sovereignty set forth in amendments 17-22 of Article IV, Part Third of the Maine Constitution all concern the power to initiate and approve, repeal, or approve conditionally-proposed laws.  The Electors' decisions on proposals offered under each of these authorities have the force of law.

When Electors exercise the powers set forth in these amendments, as well as the more longstanding power to ratify constitutional amendments and approve bonds, individually and collectively, they are "the Government" within the meaning of the First Amendment's guarantee of "the right to petition the Government for redress of grievances."   U.S. Const, 1ˢᵗ Am.[14] Moreover, when acting in their capacities in the exercise of each of these powers, the Electors not only have the right to petition one another, they have to right to be petitioned by one another. Those rights, too, are protected by the First Amendment. Moreover, it bears emphasis that, even with respect to the direct initiative power, the Electors lack the power to act without the Legislature.  Although direct initiative is commenced by petition, if that proposal garners sufficient signatures, it must be submitted to the Legislature, which may enact it without change, produce a competing measure, or do nothing.  Me. Const., art. IV, Pt. 3d § 18.  Because the Initiative applies to the entirety of the legislative process for each of the Ballot Measures to which it applies, it

---

[14] The following arguments apply equally to Plaintiffs claims in Count VI that the Initiative violates their right to petition the government under Article I, Section 15 of the Maine Constitution.

necessarily applies to the Legislature's consideration of these three options.  The Initiative, however, bars Foreign Entities from attempting to "influence" the Legislature's decision and also exposes Plaintiffs and all other persons from doing the same using any Section 1064(2) materials or communications.

This is also true of any attempts to "influence" the Legislature's issuance of a constitutional amendment, conditional legislation, or a bond, because, as has been explained above, the Initiative applies to the "initiation" of each of these Ballot Measures. Therefore, it should be clearly understood that the Initiative is not only a control and limit on the Electors access to information from Foreign Entities when considering whether to approve a Ballot Measure at a general election, the Initiative also bars and criminalizes Electors' interaction with their own legislators at every point where, at some point in the process, a Ballot Measure requires the Legislature to act.

The Supreme Court has observed that "the rights to peaceably assemble and to petition for redress of grievances are among the most precious liberties safeguarded by the Bill of Rights." *U.M.W, Inc. v. Ill. State Bar Assoc.*, 389 U.S. 217, 222 (1967).[15]  Indeed, it has noted that "[t]he very idea of a government of a republican, republican in form, implies a right on the part of its citizens to meet peaceably for consultation with respect to public affairs and to petition for redress of grievances." *DeJong. v. Oregon*, 299 US. 353, 364 (1937), quoting, *United States v. Cruickshank*, 92 U.S. 542, 552 (1875).  So interrelated and interdependent are the rights to freedom of speech, assembly, the press, and the right to petition the government, that the *DeJong* Court described them as "cognate" to one another. *Id*.

---

[15] The Supreme Court set forth the  historical and legal origins of the right to petition the government in *McDonald v. Smith*, 472 U.S. 479, 482-484 (1985).

The Supreme Court rejected an assertion that the Sheman Anti-Trust Act limited the rights of a party to petition the government, "[i]n a representative democracy such as this, [the legislature and the executive] act on behalf of the people and, to a very large extent, the whole concept of representative government depends on the ability of the people to make their wishes known to their representatives." *Eastern Railroad Presidents Conference v Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961).   In *McDonald v. Smith*, 472 U.S. 479, 489 (1985) (italics in original),  the Court quoted James Madison, speaking to the House of Representatives' consideration of the First Amendment that:

> The right of freedom of the press is secured; liberty of the press is expressly declared to be beyond the reach of this Government; the people may therefore publicly address their representatives, may privately advise them, or declare their sentiments by petition to the whole body; in all these ways, *they may communicate their will*.

By prohibiting Foreign Entities from contributing or expending monies "to influence"— that is, through all means of communication to persuade Electors to promote, support, oppose or defeat a given Ballot Measure—the Initiative unconstitutionally violates the right to petition by barring those Foreign Entities from petitioning them in their capacities as Electors and unconstitutionally deprives Plaintiffs, in that same capacity, the opportunity to consider, evaluate, and judge for themselves, the pertinence of the communications and materials comprising the Foreign Entities' petition.

In all these respects, the Initiative violates Plaintiffs' right to petition the government.

**Rights of Association**:   "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association [which includes a] close nexus between freedoms of speech and assembly."  *NAACP v. Alabama*, 357 U.S. 449, 460 (1965).  Consequently, "state action which may have the effect of curtailing the freedom to

associate is subject to the closest scrutiny." *Id.*  Freedom of association is among the "indispensable liberties" that also include freedom of speech and of the press.  *Id.* The First Amendment's protections in this regard extend to curbing "possible unconstitutional intimidation of the right to advocate." *Id.*, citing, *States v. Harriss*, 347 U.S. 612, 625-626 (1954); *United States v. Rumely*, 345 U.S. 41, 46-47 (1953).  These rights of association are also inherent in and essential to the right to petition government, and they too are threatened by the Initiative's unrestrained objective to suppress any efforts to "influence"—that is to persuade, to promote, support, oppose, or defeat a given Ballot Measure—whether by the Foreign Entities or plaintiffs as individual persons or as Electors.

As has been noted above, the Initiative ostensibly ties its prohibitions "influence" to contributions, donations, expenditures and disbursements, but this provides no refuge from the rigors of the First Amendment. Prohibitions which masquerade as simply a ban on contributions and donations and expenditures and disbursements, that changes nothing because those are also forms of political speech as well as association.  *McCutchen v. F.E.C.*, 572 U.S. 185, 212 (2014); *Buckley v. Valeo*, 424 U.S. 1, 21-22 (1976).

"[The Supreme Court has] recognized that contribution limits may bear 'more heavily on the associational right than on freedom to speak,' since contributions serve 'to affiliate a person with a candidate" and "enabl[e] like-minded persons to pool their resources,'" *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 135, 124 SCt. 619, 656, 157 L. Ed. 2d 491 (2003)(citing *Buckley*, 424 U.S., at 22, 96 S.Ct. 612; *Shrink Missouri, supra,* at 388, 120 S.Ct. 897). The freedoms of speech and association, follow in lockstep within the political expenditure context, as contributions "leave the contributor free to become a member of any political association and to assist personally

17

in the association's efforts on behalf of candidates," and allow associations "to aggregate large sums of money to promote effective advocacy." *Id.*

Laws which violate the right to petition as well as its accompanying associational freedoms, "are subject to strict scrutiny, which requires the Government to prove that the restriction [1] furthers a compelling interest and [2] is narrowly tailored to achieve that interest." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S. Ct. 315, 323, 89 L. Ed. 430 (1945); *Citizens United*, 558 U.S. at 310 (emphasis added).

> Both speech and petition are integral to the democratic process, although not necessarily in the same way. The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs. Beyond the political sphere, both speech and petition advance personal expression, although the right to petition is generally concerned with expression directed to the government seeking redress of a grievance.

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011).

The Initiative lacks any legislative findings explaining the reasons for its enactment. Although it is principally directed at Foreign Entities and the suppression of their participation in any way in public policy discussion concerning Ballot Measures, the Initiative fails to provide any clear rationale for these draconian restrictions which, as has been shown, it also imposes on the Plaintiffs and all citizens and residents of Maine.  Plaintiffs will not, at this point, speculate on Defendants' justification for the Initiative but would note that the Initiative, including any justification for it, requires the strictest scrutiny and, if any legitimate rationale be found, the Initiative must be shown to have been narrowly tailored to serve that particular interest.

**2. Plaintiffs are likely to prove that the Initiative violates their First Amendment right to Freedom of Speech**

Plaintiffs' arguments with respect to the Right to Petition the Government apply with equal force to Plaintiffs' related claims that the Initiative violates their Freedom of Speech.[16] The Initiative places severe constraints on political speech with respect to Ballot Measures. It accomplishes this by banning Foreign Entities from contributions or donations or expenditures or disbursements "to influence" the initiation or approval of these Ballot Measures. If "influence" is assumed to mean "promote, support, oppose or defeat," ( 21-A MRS § 1052(4-A)), then the Initiative clearly bars Foreign Entities from providing information or materials with respect to a Ballot Measure, even if the entity takes no position with respect to it, if the information or materials are employed to "influence" the initiation or approval of that Ballot Measure. Exhibit A, Sec. 1-§ 1064(2). This amounts to suppression of speech from any Foreign Entity with respect to any Ballot Measure.

The Initiative bans speech on inherently public issues from certain sources, thus impairing Freedom of Speech. The Supreme Court has held an "[a]bridgment of the liberty of [speech] can be justified only where [there is a] clear danger of substantive evils aris[ing] under circumstances affording no opportunity to test the merits for acceptance in the market of public opinion." *Thornhill v. Alabama*, 310 U.S. 88, 104-105 (1940). Therefore, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCulloch v. F.E.C.*, 572 U.S. at 210, quoting, *United States v. Playboy Enterprises Entertainment Group, Inc*. 529 U.S. 803, 816 (2000).

---

[16] Plaintiffs' arguments with respect to Freedom of Speech also apply to their Freedom of Speech claims under Article I, Section 4 of the Maine Constitution as set forth in Count VII.

The Initiative forbids and criminalizes speech (and all related associational rights) with respect to Ballot Measures. Public discussion of such popular initiatives, including speech addressed to both elected representatives and the voting public, is "political speech", which is "at the zenith" of the forms of speech the First Amendment protects. *Meyer v. Grant*, 486 U.S. 414, 425 (1988).[17] Though the Initiative purports to ban only contributions and donations and expenditures and disbursements, that changes nothing because those are also forms of political speech as well as association. *McCutcheon v. F.E.C.*, 572 U.S. 185, 212 (2014); *Buckley v. Valeo*, 424 U.S. 1, 21-22 (1976).

Neither does the Initiative's principal focus on Foreign Entities (though it also applies to "all persons")[18] absolve its unconstitutionality, because the First Amendment bars the government from distinguishing among speakers. *Citizens United v. F.E.C.*, 558 U.S. 898-899 (*citing*, *First National Bank of Boston v. Bellotti* 435 U.S. at 784).

The Supreme Court has recognized a legitimate governmental interest, and places some constraints, on candidate election due to concerns of *quid pro quo* corruption or the appearance thereof. *See Citizens United v. F.E.C*, 558 U.S. 310, 361 (2010).[19] Where ballot measures are concerned, the Court has recognized that "[t]he risk of corruption perceived in cases involving candidate elections [citations omitted] is simply not present in a popular vote on a public issue." *Citizens Against Rent Control v. City of Berkeley*, 360 U.S. 290, 298 (1981); *see also*, *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 787, n. 26.[20]

---

[17] Considering First Amendment claim regarding circulation of petitions for a Ballot Measure.
[18] Exhibit A, Sec. 1-§ 1064)(11); *see also*, *Id.* at Section 1064(3)-(5).
[19] Even in the context of candidate elections, the Court has recognized a distinction between "express advocacy"—advocacy for or against a candidate—and "issue advocacy", *F.E.C. v. Wisc. Right to Life*, 551 U.S. 449, 470 (2007).
[20] The *Bellotti* Court characterized the statutory limitation on the participation of corporations in the voters' consideration of ballot measures as "highly paternalistic." 435 U.S. at 792, n. 31.

In addition to the violation of Plaintiffs rights as Electors to both petition the government, and to be petitioned, the Initiative also violates Plaintiffs' Freedom of Speech rights under the First Amendment by blocking Foreign Entities from providing information or materials to them which they, in their discretion, review, evaluate, accept or reject. The Supreme Court has made clear that the right to receive speech is protected by the First Amendment. *Stanley v. Georgia,* 394 U.S. 557, 564 (1969). This protection also encompasses information and ideas from foreign speakers. *Lamont v. Postmaster General*, 381 U.S. 301, 302 (1965) (right to receive communist propaganda); *see also*, *Procunier v. Martinez*, 416 U.S. 396 (1974) (rights of persons not prisoners to send mail to and receive mail from inmates).

The Initiative also violates Plaintiffs related associational rights protected by the First Amendment's protection of the right to petition, to freedom of speech, to freedom on assembly, and to freedom of the press by barring Plaintiffs, on pain of severe criminal and civil sanction, from either soliciting or receiving a contribution prohibited by Section 1064(2) and providing "substantial assistance" with respect to a contribution or donation or expenditure or disbursement by a Foreign Entity in violation of Section 1064(2). Exhibit A, Sec. 1-§§ 1064(3)-(4).

Plaintiffs have an associational right protected by the First Amendment to make contributions or expenditures with respect to Ballot Measures. *Buckley v. Valeo*, 424 U.S. at 20-21; *see also*, *Citizens United v. F.E.C*, 558 U.S. 310 (2010). Yet the Initiative does not attempt to limit or regulate either, it simply imposes a blanket ban, binding on Plaintiffs, as to both. In so doing, the Initiative violates Plaintiffs' associational rights as protected by the First Amendment.

Plaintiffs have demonstrated a likelihood of success on their Freedom of Speech claim, including all related associational rights, because the Initiative seriously impairs their right to receive information and materials from Foreign Entities and, as they may choose, to freely

disseminate such information and materials. Moreover, there is no legitimate State interest justifying the Initiative's sweeping incursion into Plaintiffs' First Amendment rights.

### 3. Plaintiffs are likely to prove that the Initiative violates their First Amendment right to Freedom of Assembly

Plaintiffs' arguments with respect to the Right to Petition the Government and Freedom of Speech apply with equal force to Plaintiffs' related claims that the Initiative violates their Freedom of Assembly.[21] "Freedom of Assembly includes the right to discuss and inform people concerning, the advantages and disadvantages [of public issues]." *Thomas v. Collins*, 323 U.S. 516, 532 (1940).

By barring Foreign Entities from producing information and material "to influence" the initiation or approval of a Ballot Measure, and denying Plaintiffs right to use, consider, and, disseminate such information and material as set forth above, the Initiative necessarily impairs Plaintiffs' Freedom of Assembly rights, because the inability to formulate a communication with respect to a Ballot Measure necessarily precludes any possibility of a gathering, whether large or small, to consider it. *Thomas* 323 U.S. at 532 (1940).

For the foregoing reasons, Plaintiffs have demonstrated that they are likely to succeed on the merits in their claim that the Initiative violates their right to freedom of assembly as protected by the First Amendment.

### 4. Plaintiffs are likely to prove that the Initiative violates their First Amendment right to Freedom of the Press.

By placing duties and restrictions on television, radio broadcasting stations, providers of cable or satellite television, print news outlets, and Internet platforms, the Initiative is intended to

---

[21] Plaintiffs arguments with respect to Freedom of Speech also apply to their Freedom of Assembly claims under Article I, Section 4 of the Maine Constitution as set forth in Count VIII.

and will have the effect of chilling the press, discouraging them from proving information from Foreign Entities prohibited by Section 1064(2) to the public.  Exhibit A, Sec. 1-§ 1064(7).

In their individual capacities and as registered voters and Electors, the First Amendment protects Plaintiffs right to be free of any unwarranted and insufficiently justified "limitation on their right to the unfettered exercise of [their] First Amendment rights." *Lamont v. Postmaster General,* 381 U.S. at 307.  The Supreme Court has long held that information is essential to a vital and robust public discussion, but this premise assumes that the public has access to the information and materials essential to that discussion. *See*, *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) (It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC."). Section 7 of the Initiative violates Plaintiffs' right to a free press, both in their individual capacities and in the exercise of their duties and responsibilities as Electors.

     **5.**    **Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Initiative violates the Electors' right to Notice under the Due Process Clause**

The Initiative places all persons, including Plaintiffs, at risk for serious criminal and civil sanctions. As such, the Initiative must satisfy basic notice standards imposed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as the Due Process and Law of the Land provisions of the Constitution of Maine.  U.S. Const., XIV Am,; Me Const., art. I, §§ 6, 6-A. In particular, the Initiative must set standards with sufficient clarity so that the general public, including Plaintiffs, have "fair notice of what is prohibited", and prevents discriminatory, standardless enforcement.  *Federal Communications Commission v. Fox Television Stations*, Inc., 567 U.S. 239, 253-254 (2012); *see also*, *Connally v. General Construction*, 269 U.S.

385, 393 (1926).  The Initiative presents two serious due process issues, both of which result in the Initiative failing to supply Electors with fair notice, as constitutionally required.

The Initiative lists the entities that may qualify as "Foreign government-influenced entities." This list includes "[a] firm, partnership, corporation, association, organization or other entity." Exhibit A, §1-§1064(1)(E)(2).  The terms "association", "organization", and "other entity" are all terms undefined by Maine law. Further, these terms lack any common or ordinary meaning. By example, two individuals carrying business with one another create a partnership. A partnership requires no organizing documents, or any other manifestation of intent to create it. By failing to define "association", "organization", "other entity", Electors are left to guess if a partnership falls within the prohibited group of entities, and, therefore, the Initiative is inherently ambiguous. This ambiguity presents for all other assemblies of individuals.

Further, the Initiative applies to "[a] firm, partnership, corporation, association, organization or other entity" that "[d]irects, dictates, controls or, directly or indirectly participates in the decision-making process with the regard to the activities of the firm, partnership, corporation, association, organization or other entity." Exhibit A, § 1-§ 1064(1)(E)(2)(B).  The foregoing standard lacks any reference to an authoritative source by which a person, including Plaintiffs in their capacities as registered voters and Electors, can obtain the information necessary to make this determination.

Due process "demands … that [a] law shall not be unreasonable arbitrary, or capricious and that the means selected shall have a real and substantial relation to the object sought to be attained." *Nebbia v. New York*, 291 U.S. 502, 510-11 (1934). With no means of predicting when an Elector may run afoul of the Initiative, a Class C crime, the Initiative is facially arbitrary and violates due process.

The Initiative provides that if a "foreign government" or "[a] firm, partnership, corporation, association, organization or other entity" that "[h]olds, owns, controls, or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests" then that entity is deemed a "foreign government influenced entity" and is thus prohibited by the Initiative. *Id*., §1-§1064(1)(E)(2)(a).

Likewise, this standard provides no reliable source on which State officials may rely to initiate criminal or civil proceedings, raising the risk of arbitrary and discriminatory enforcement. Further, an Elector has no possible means of looking within a business entity and determining the ownership makeup of that entity, much less the methods in which contributions are made and who has influence over those decisions. As no feasible method of determining percentage ownership of an entity exists, let alone the influence that may cause a contribution to be made, the Initiative is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt …." *Teneco Oil Co., Inc. v. Dep't of Consumer Affairs*, 876 F.2d 1013 1021 (1st Cir. 1989) (quoting, *Pennell  v. City of San Jose*, 390 U.S. 485 U.S. 1, 11 (1988)).

Both due process issues, the ambiguous and undefined terms as well as the impossible to ascertain threshold for criminality, leave the Initiative unconstitutionally vague as "it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 1688, 29 L. Ed. 2d 214 (1971).

### 6.  Plaintiffs are likely to succeed in their claim that the Initiative violates the separation of powers under the Maine Constitution.

Article III of the Maine Constitution expressly provides that the powers of government are divided between the legislative, executive, and judicial departments.  Me. Const., art. III, ,§ 1.  It

then reinforces this allocation of power with the directive that "[n]o persons, belonging to one of these departments, shall exercise any of the powers properly belonging to the either of the others, except in the cases herein expressly directed or permitted." *Id.* at § 2. The Law Court has held that, in light of this directive, the formal test for determining a violation of the separation of powers under the Maine Constitution, is "much more rigorous" than the functional test applied to such questions under the U.S. Constitution. *Bates v. Dept. of Behavioral & Developmental Services*, 2004 ME 154, ¶ 84, 863 A.2d 890.

As has been seen, under the Maine Constitution, both the Legislature and the Electors have lawmaking powers. As has also been seen, however, for each Ballot Measure, the Electors exercise of their lawmaking is in some way dependent on the Legislature. Because the Initiative interferes with, obstructs, and even criminalizes the Electors acting in that capacity, with their Legislators, with respect to Ballot Measures, in those respects and to that extent, the Initiative violates the separation of powers.

The Electors have Article III standing to bring this separation of powers claim under the Maine Constitution. *Collins v Mnuchin*, 896 F.3d 640, 653-654 (5th Cir. 2018).

**B.    Plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief.**

The arguments set forth above have shown that the Initiative violates Plaintiffs First Amendment rights, including their right to petition the government, and, as registered voters and Electors, their right to be petitioned with respect to Ballot Measures. In their verified complaint, Plaintiffs have made clear their intention to fully exercise their First Amendment rights, even at the risk of civil and criminal sanction. The Supreme Court has made clear that, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also*

*Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla,* 490 F.3d 1, 21 (1st Cir.2007)(applying *Elrod* to irreparable harm component of permanent injunction analysis); *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury.").

Plaintiffs have established a likelihood of success on all of their First Amendment claims but, if this Court were to conclude that they had only made that showing as to one of them, under *Elrod v. Burns*, injunctive relief should issue.

### C.    Balance of Harms

Under the balance of harms prong, the moving party must show that, "the balance of equities tips in his favor." *Voice of the Arab World, Inc. v. MDTC Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Here, the balance tips heavily for Plaintiffs. Absent injunctive relief, Plaintiffs would be threatened with enforcement of an unconstitutional law and more importantly a Class C felony.[22]

An injunction issued to Defendants will cause no harm as it will simply preserve the status quo while this Court considers the Initiative's constitutionality under what presumably will be an expedited schedule. See, *Decker v. Independence Shares Corp.*, 311 U.S. at 290; *Matos v. Clinton School Dist.*, 367 F.3d 72.

### D.    Public Interest

This Court has observed that "[i]t is hard to conceive of a situation where the public interest would be served by the enforcement of an unconstitutional law or regulation." *Condon v. Andino*, 961 F.Supp. 323, 331 (D. Me. 1997). Here, Plaintiffs have shown that the Initiative severely

---

[22] "When Government seeks to use its full power, including the criminal law, to command where a person may get his information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." Citizens *United v. F.E.C.,* 588 U.S. at 356.

constricts their right to petition the government, their right to freedom of speech, their right to freedom of assembly, and their right to a free press, all freedoms protected by the First Amendment.

This being so, the public interest prong is effectively determined by the Supreme Court's determination that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. at 373.   This unusually sensitive standard for determining irreparable injury, also answers the public interest inquiry.   The public interest in this case overwhelmingly favors the issuance of an injunction to preserve Plaintiffs exercise of their fundamental freedoms and to insulate them from intimidation and coercion by Defendants in their threatened enforcement of the Initiative' unconstitutional terms.

## IV.   CONCLUSION

Plaintiffs have shown that they are likely to succeed on the merits of their claims that the Initiative violates their right petition the government, their right to freedom of speech and assembly, and, their related associational rights under the First Amendment, along with their comparable claims under the Maine Constitution.  They have also shown a likelihood of success that they will prevail on their Due Process claims under the Fourteenth Amendment and under comparable clauses of the Maine Constitution.  Finally, they have shown that they are likely to prevail in their claim that the Initiative violates the separation of powers guaranteed by the Maine Constitution

Plaintiffs have also shown that, if the Initiative is enforced, they are at risk of severe and irreparable injury and that the balance of harms favors issuance of injunctive relief.  Finally, the public interest heavily favors the issuance of an injunction protecting Plaintiffs from the serious harms that would be imposed upon them if the Initiative were enforced.

WHEREFORE, Plaintiffs move this Court for entry of injunctive relief barring Defendants from enforcing the Initiative until such time as the Initiative's constitutionality has been adjudicated.

By their attorneys,

DATED: December 15, 2023

/s/ *Timothy C. Woodcock*
Timothy C. Woodcock, Bar #1663
P. Andrew Hamilton, Bar #2933
Jonathan Pottle, Bar # 4330
*Counsel for Plaintiffs*

EATON PEABODY
80 Exchange Street
Bangor, ME 04401
(207) 992-4318
twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
jpottle@eatonpeabody.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December, 2023, I caused the foregoing document to be served upon all counsel of record via email.

/s/ *Timothy C. Woodcock*